**FILED**

JUN 3 0 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| Kimberly C. Vasconez, | CASE NUMBER  1:05CV01346 |
| *Plaintiff* | JUDGE: Ricardo M. Urbina |
| | DECK TYPE: Employment Discrimination |
| v. | DATE STAMP: 06/30/2005 |
| Michael Chertoff, in his official capacity as Secretary United States Department of Homeland Security | JURY DEMAND |
| *Defendant* | |

## Section I. GENERAL ALLEGATIONS

1. Kimberly Vasconez (hereinafter "Mrs. Vasconez" or "Plaintiff") is an individual who is, and at all times relevant herein was, a resident of the County of Fairfax, in the Commonwealth of Virginia.

2. The defendant Michael Chertoff is sued in his official capacity as Secretary of the United States Department of Homeland Security for Emergency Preparedness and Response Agency) hereinafter referred to simply as defendant or DHS-EP&R.

3. Defendant hired plaintiff as an employee, and plaintiff's work site was located in Washington D.C.

4. Jurisdiction is premised upon 28 U.S.C. 1343.

5. Venue is proper under 28 U.S.C. 1391, because (1) the operative facts occurred in Washington D.C., (2) but for the discriminatory conduct plaintiff would have worked in Washington D.C., and (3) records related to the employment actions in question are located in Washington D.C.

### Section II  Statement of Administrative Action

6.  Plaintiff filed an informal administrative complaint and a formal administrative complaint on July 29, 2003.

7.  The agency accepted sex (female) and reprisal for prior EEO activity as the basis of her initial and amended complaint. The two primary issues in the complaints are non-selection for promotion and a pattern of harassment.

8.  On September 15, 2003 and December 15, 2003, the defendant accepted the following issues for investigation:

8A. In July 2003 the plaintiff was assigned as a member of the Homeland Security Team to de DHS Center to do shift work. This assignment is unfavorable for several reasons, and plaintiff believes it is in retaliation for providing a statement during the investigation of another employee's EEO complaint in April 2003.

8B. the request of the plaintiff for reconsideration of this assignment has not been adequately addressed by management in light of her disclosure of her medical issues and those of her child with special needs.

8C. From January through October 2003, the management officials of the plaintiff were hostile toward her participation in the ERT-N-NCR effort, criticizing the team, making negative comments to other staff members, not supporting her reimbursement for local travel cost, and having a staff member not associated with the team to sit in unannounced on conference calls to report back what she had heard.

8D. Her management officials have intentionally delayed advertising two GS-15 positions that she acted in for long periods of time. These are the Logistics Section Chief and the former Response Operations Section Chief positions. All other formerly vacant GS-15 positions have been advertised and filled. In January or February 2003, a male GS-15 employee was transferred into the Logistics Section Chief position, allegedly to prevent Ms. Vasconez from filling the position.

8E. During her tenure, her management official did several things to undermine and reduce her authority. He tasked her staff but did not inform Ms. Vasconez; he delayed giving a promotion to one of her staff members; he did not address her need for staff and resources; and when one of Mrs. Vasconez' male

employees was insubordinate, he told her he would deal with the charges but he never did.

8F. In January 2003, because of the continuing hostile work environment, Ms. Vasconez felt compelled to ask for a second change in position, even though this meant taking a non-supervisory position. Once moved to her new position, her former management official attempted to take duties away from her branch.

8G. The hostile work environment was created previously and she was forced to request her first position change outside of Logistics in early 2002. Once she was transferred to the Response Operations and Analysis Section, she was removed from the Emergency Support Team Logistics Section Chief position, although she had filled this role for all but three operations/activations from October 1994 to July 2002. Although she was the most qualified for the position, she was replaced, allegedly because she no longer worked for the Logistics Section organization. However, Ms. Vasconez believes this was just an excuse as other staff members not working in the day-to-day organization fill many EST positions.

8H. While acting as the Chief of the Response Operations and Analysis Section, her management official included male employees in meetings that they did not need to be included in. These meetings related to the mission and functions of her organization, not theirs. He also reduced her role, and that of the program manager working for her on the National Emergency Response Team Program, to "secretaries," and when Ms. Vasconez attempted to manage the program, he would reverse her decisions without telling her.

8I. Ms. Vasconez was denied compensation at the GS-15 salary when from August 2001 through late July 2002; she served two 120-day details as the Logistics Division Director, a GS-15 position. Her male counterparts were given GS-15 salaries.

8J. Ms. Vasconez developed and managed the National Urban Search and Rescue program from April 1991 through October 1994 at the GS-12 level. She held a lower grade level than all of the other employees who ran this program, all of whom are male. This program was established with a GS-13 male team leader, but he was assigned other duties while she served as the program manager. She was replaced in 1994 with a male GS-13 employee who was later promoted to GS-14 in 1997. This employee performed the same duties and had the same level of responsibility that she had as a GS-12. Now the program head is a GS-15 male employee, who was a contractor working for Ms. Vásconez, and has the same duties that Ms. Vasconez had when she was managing the program.

9. On March 29, the plaintiff filed a new administrative complaint, and on April 21, 2004, the agency issued an amendment adding the following additional allegations to her charge:

9A. She applied for four logistics supervisory vacancies in March 2004. These positions called for logistics expertise, yet they were never advertised on the FEMA website. She believes this was to prevent from competing for the positions.

9B. On February 2, 2004, management reassigned her telephone number to a new employee. She repeatedly told management it was critical to keep her original phone number since she had used that number since April 8, 1991, and she gave that number as her emergency contact to her children's schools, day care, etc. After she complained, an attempt was made to restore her number, but it, in fact, was not restored. When she wrote to the Helpdesk to inquire about this, they never responded.

9C. She applied for three Supervisory Program Specialist vacancies in the Support Section, Logistics Branch, Response Division, in February 2004. Although these are key management positions, none of the announcements included logistics background, which is her strong suit. She believes this was to prevent her from competing for the positions. As of this date, she has not been contacted for an interview.

9D. On November 11, 2003, she discovered that Operations Branch management had moved her items from her office, including her accountable property, without warning or informing her. Management has ignored or provided obstinate unreasonable responses to her numerous requests to locate her items and process property transfer paperwork to absolve her of responsibility for her previous equipment. Management had also ignored her requests to move two file cabinets to the mezzanine for over one year and by the time of her departure from the DHS in January 2005, management still has not returned much of her accountable property and she had to explain this to the DHS-EP&R Agency Property Management Official upon her out-processing. Moreover, it almost one and one-half years for her to locate and take possession of six boxes containing her personal property. DHS-EP&R management did nothing to locate her boxes once they were moved from her former office.

9E. Although she was an integral part of the ERT-N National Capital Region, she has removed from the team September 18, 2003, the day before Hurrican Isabel was to hit the Washington, D.C area. However, she never received the formal letter removing her from the team until she went to Headquarters on November 11, 2003 and found her office moved. Her mail had been piling up in her old in-box for over two months and had never forwarded to the Homeland Security Operations Center (HSOC) for her.

9F. Since she moved full-time to HSOC, she has attempted to transfer to parts of the Agency on several occasions but her efforts have been undermined by her management. The Branch Chief, Response Services Branch, Response Division, led her to believe that he would help her find a transfer yet the only people he

contacted were management officials directly involved in her complaint. Then, his Deputy wrote her an email and insinuated that she was not wanted in other parts of the Agency. Finally, through her own efforts, she gained the interest of both the Director of the Office of International Affairs, and the Deputy Director, Preparedness Division, each of whom tried to work out trades of employees with her management but nothing materialized.

9G. Since she moved full-time to the HSOC, she has attempted to apply for several other positions but Response management has taken actions or exerted influence to prevent her from competing each time. Specifically, she applied for the Mobile Operations Branch Chief vacancy during the summer of 2003. She was especially qualified for this position since it called for expert knowledge of logistics. However, once she applied, the position was cancelled and re-advertised and instead of logistics the second announcement called for expert knowledge in information technology. She still intended to apply for the position but when she arrived at her office on November, 11, 2003, her computer and boxed had been removed and IT was unable to hook up her computer prior to the application deadline.

9H. She also applied for the position of Supervisory Program Specialist, Capability Assessment & Support Section, Capability and Assurance Branch, Preparedness Division, in December 2003. This position was re-advertised and she applied again but was not selected. This position is under a management official who is a close ally of the management official against whom she filed her complaint.

9I. She applied for the position of Logistics Deputy Director, Logistics Branch, in the Response Division. The position was only advertised for a two-week period. Due to technical difficulties, she submitted the application at midnight on the closing date. Even though she attempted to explain the technical difficulties, her application was rejected.

9J. Response Division management ignored her appeal for a new assignment while they addressed a similar appeal from her male counterpart. He was never required to work shift rotations and he was a placed in the position of the deputy to another management official. In addition, her management official requested substantial documentation to support the appeal of her male counterpart and even went as far as contacting his physician. Whereas, when she presented similar documentation for her own appeal, he said he did not want it. Moreover, in January 2004, her male counterpart was rewarded with a one-year assignment with a high-level DHS task force.

9K. After she mentioned her differential treatment to a Human Resources employee, her management official requested documentation from her physician to support her appeal. In his letter, date October 20, 2003, he stated he could not consider the medical condition of her child as a basis for medical

accommodation. However, her attorney has advised her that the Agency cannot disregard her daughter's disabilities and needs in considering her request for special accommodations. Because of her night shift requirements, she is no able to give her daughter the support she needs to overcome her disabilities. As a result, she had to re-institute occupational therapy for her and she will have to go to summer school due to her inability to work with her during the 2004-2005 school year.

9L. In addition, special accommodations have been made for other parents. They are allowed to work from home, they are allowed to get off from work, or they are placed on special shifts on emergency teams. She has not been allowed any of these accommodations.

9M. In addition, she believes the National Emergency Operation Center (NEOC) Unit is built on male dominance since most of the Watch Analysis are female. She is the only female Watch Officer remaining. Also, she learned that when DHS reissued badges, two of her male counterparts had higher-level clearances than she had. However, her management official told her that the Agency would probably not invest in a higher-level clearance for her. Finally, she was the lowest paid NEOC or HSOC Watch Officer with a clearance for over 1 1/5 years.

9N. In addition, this was the first year in 18 years that she has not received a cash bonus or quality step increase even though she sacrificed holiday leave and worked on December 25, 26, 27, 28, and January 1, 2, and 3. Moreover, a male counterpart who is not qualified for the Watch Officer position was just awarded $1,500 for performing the same job that the other Watch Officer performs.

9O. In August 2003, she requested an audience with the Chief Operating Officer, and he was patronizing towards her. He suggested that she first meet with the Director, Response Division. She told him she had tried that but she was told to meet with the Operations Branch Chief instead. The Operations Branch Chief is the management official against whom she filed her complaint, and he never addressed her concerns. The Chief Operating Officer then arranged for her to meet with the Director, Response Division, and the Operations Branch Chief. During this meeting, the Director, Response Division, was insulting and inflammatory and the Operations Branch Chief did not speak. Ultimately, the Chief Operating Office met with her male counterpart who also requested an audience with him, but he did not meet with her.

9P. She was subjected to unduly burdensome requirements from administrative support regarding time and attendance, audits for leave carryover purpose, and other matters.

9Q. She was retaliated against when she was not assigned to be acting NEOC Chief in August 2003 while she was still working at FEMA headquarters. A junior

GS-14 was assigned even though Ms. Vásconez had seniority over her as well as considerably more management experience.

9R. It appeared that management either did not care or intentionally delayed getting help to resolve the staffing shortages of the NEOC and HSOC. This placed a heavy burden on her and other employees working night and weekend shifts. Other HSOC desks were staffed with either contractors or lower-graded employees (GS-12 to Gs-13)".

10.   42 U.S.C. 2005-e 16 (c) gives plaintiff a private right of action as follows:

Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

11.   Plaintiff has exhausted her administrative remedies because (1) the agency completed its investigation and mailed plaintiff with notice of her rights on May 10, 2005 and (2) more than 180 days has past since the filing of the formal complaint.

### Section III. Liability Facts and Rationale

12.   Defendant at all times relevant hereto had actual and constructive knowledge of the conduct described in this complaint.

13.   Defendant is liable for the conduct at issue in this complaint, because he failed to take prompt or effective measures to prevent gender and retaliatory harassment.

14.   Defendant is further liable for the acts described herein, because he (1) failed to adequately supervise, control or discipline and/or otherwise penalize the conduct and (2) employees harassing plaintiff acted at the behest of the defendant, (3) defendant sanctioned, ratified, and the conduct.

15. Defendant knew or should have known plaintiff was experiencing humiliation reasonably occurring and likely to occur based on gender harassment and retaliation. Due to the employer's failure to take prompt and appropriate remedial action, plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

16. Agency policy contains no effective means of deterring or correcting harassing behavior, because the agency equal employment opportunity officials lack power and authority within the agency's bureaucracy to compel prompt compliance with civil rights legislation. Absent court imposed injunctive relief the defendant will continue to maintain this administrative structure.

### Count I Gender Harassment/Substantive Due Process

17. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 16, inclusive, and incorporates the same by reference as though set forth fully herein.

18. The due process clause of the Fifth Amendment to the United States Constitution and 42 U.S.C. 2000 et seq. provides the federal government may not discriminate based upon sex. This constitutional provision makes it unlawful for a federal agency to make employment decisions based on an applicant or employee's gender. Defendant bears a duty to treat employees equally regardless of their gender.

19. Defendant breached this duty by imposing differential work conditions, job duties, and adverse and negative treatment of plaintiff based solely upon her gender. Similarly situated males within the agency are not subjected to the abuse outlined above.

20. The type of job performed by plaintiff fails to give defendant a bona fide occupational qualification rationale the conduct described herein, and the government lacks a compelling governmental interest in treating this particular plaintiff less favorable than male employees.

21. The defendant's conduct alleged above subjected plaintiff to severe and pervasive hostile work environment based upon her gender.

Count II Glass Ceiling in Promotions

22. The unwelcome gender harassment created an intimidating, oppressive, hostile and offensive work environment and interfered with plaintiff's emotional well being and ability to work.

23. Plaintiff falls into a category protected from discrimination under Title VII of the Civil Rights Act of 1964 as amended, because she is a female.

24. Plaintiff applied for each of the positions listed above.

25. The agency opted instead to hire a male as described above.

26. The circumstances in each incident listed above give rise to an inference of discrimination, because the agency hired less qualified applicants outside her protected category.

27. In each of the promotional opportunities listed above, gender was either a decisive and/or a substantial factor in the hiring decision.

28. A glass ceiling exists within FEMA hindering promotions can be demonstrated by the fact that the proportion of women in the ranks of higher management is substantially less the percentage of women at lower grade levels and the proportion of high ranking female employees within FEMA is less than comparable agencies and corporations.

### Count III Equal Pay Act

### Count IV   Retaliation/Freedom of Speech

The facts alleged above demonstrate plaintiff engaged in protected equal employment opportunity activity.

During the EEO complaint process Ms. Vasconez voiced her view about the defendant's discriminatory employment policies, procedures, and customs. Her protected EEO activity did not merely deal with incidental issues pertaining solely to her. Rather her activity critiqued and laid bare a network limiting promotional opportunities for all women within a high profile federal agency. As tax payers and informed citizens, the public has a strong interest in the employment practices of federal agencies. Gender discrimination breaks public trust and confidence and negatively impacts customer service provided by FEMA to its customers. Therefore, the testimony given by plaintiff during her employment with the defendant dealt with issues of a strong public concern.

Federal statutes create a public forum for federal employees to discuss and criticize discriminatory agency policies.

WHEREFORE Plaintiff prays that the court,

(A) Enter a declaratory judgment;

(B) Enter preliminary and permanent injunctions

(C) Order Promotion to the position Plaintiff would have held but for the discrimination;

(D) Award Lost wages

(E) Court ordered and supervised implementation of policy to take prompt measures to rectify harassment and retaliation.

(F) Award Compensatory damages;

(G) Retain jurisdiction to enforce equitable relief

(H) Public high visibility posting of verdict and declaratory in the lobby of defendant's principal place of business.

(I) Award Punitive damages

(J) Award attorneys' fees

(K) Convene a trial by jury

(L) Grant such further relief as may be just and proper.

Respectfully Submitted,

Kimberly C. Vasconez
By Counsel

_____
Michael J. Beattie
9502B Lee Highway
Fairfax, VA 22031
(703) 267-5784

Certificate of Service
Professional process server will serve a copy of the foregoing on the opposing parties.